UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BUS ASSOCIATION INDIVIDUALLY AND BY AND THROUGH ITS MEMBERS, ACADEMY EXPRESS LLC., ACADEMY LINES LLC., PANORAMA TOURS INC., PETER PAN BUS LINES, TRANS-BRIDGE LINES INC., ADIRONDACK TRANSIT LINES INC, HAMPTON JITNEY INC., LEPRECHAUN LINES INC., NIAGARA SCENIC TOURS, INC., BUS COMPANY HOLDINGS US LLC dba COACH USA, AND GREYHOUND LINES INC. <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF NEW YORK and LISA F. GARCIA, in her official capacity as Commissioner of the New York City Department of Environmental Protection, <br><br> Defendants. | COMPLAINT <br><br> 26-cv-_____- (    ) <br><br> (Jury Trial Demanded) |

Plaintiffs, by and through their undersigned counsel, Hantman & Associates, allege as follows:

## I. NATURE OF THE ACTION

1.      This action challenges Defendants' application of an extra-statutory idling-enforcement regime under New York City Administrative Code § 24-163 (the "Idling Law") and the Citizens Air Complaint Program ("CAC").

2.      The New York City Department of Environmental Protection ("DEP"), through its Commissioner, has established the CAC program to prosecute alleged Idling Law violations.

1

3.      DEP administers the CAC program under an enforcement regime in which private FMCSA passenger carriers are issued summonses and prosecuted before the Office of Administrative Trials and Hearings ("OATH"), New York City's independent administrative law court. Plaintiffs are thereby subjected to costly proceedings, monetary penalties, and fines.

4.      At the same time, publicly owned city and state motor vehicles that Defendants acknowledge are "subject to the same idling regulations" have summonses and complaints issued against them administratively dismissed and are thereby spared OATH prosecution, monetary fines, and penalties pursuant to Defendants' published and adopted enforcement policy.

5.      Plaintiffs allege that Defendants enforce the CAC Program in a manner that (i) denies private motorcoach carriers equal protection of the laws, (ii) deprives Plaintiffs of property without constitutionally adequate process, (iii) imposes unconstitutional burdens on interstate commerce, and (iv) penalizes conduct that, in the circumstances alleged herein, is reasonably necessary to comply with federal motor-carrier safety requirements. Defendants prosecute these complaints through the Office of Administrative Trials and Hearings ("OATH"). The claims arise under the Equal Protection and Due Process, the Commerce Clause, and Article I, § 11 of the New York Constitution.

6.      Plaintiffs are passenger motor carriers regulated by the Federal Motor Carrier Safety Administration ("FMCSA") and subject to the Federal Motor Carrier Safety Regulations ("FMCSRs"), including regulations governing vehicle inspection, safe operating condition, driver obligations, and record retention. See, e.g., 49 C.F.R. §§ 395.8, 396.11, 396.13.

7.      The Federal Motor Carrier Safety Administration ("FMCSA") is a federal agency within the U.S. Department of Transportation (DOT) responsible for overseeing and ensuring the safety of commercial motor vehicle (CMV) operations in interstate commerce. FMCSA's

primary function and statutory mandate are to reduce crashes, injuries, and fatalities involving large trucks and buses. Congress authorized the adoption of the regulations under 49 U.S.C. § 13902. The regulations apply to motor carriers (companies like Plaintiffs) and their drivers by enforcing the Federal Motor Carrier Safety Regulations (FMCSRs) (49 C.F.R. Parts 350–399), which cover:

- Driver qualifications (49 CFR 395.8)
- Hours of Service (Part 395)
- Vehicle inspection, repair, and maintenance (49 CFR 396.11 and 49 CFR 396.13)
- Controlled substances and alcohol testing (Part 382)
- Commercial Driver's License standards (Part 383)
- Motor Carrier Registration & Operating Authority (49 CFR Part 365; 49 CFR 390.201)

8.      Defendants' enforcement policy operates outside the Idling Law to pursue alleged violations and imposes significant monetary penalties on private FMCSA-regulated passenger carriers engaged in interstate commerce. The Idling Law does not exempt Defendants' motor vehicles from its prohibitions. Nevertheless, Defendants' enforcement policy shields non-exempt City/State vehicle fleets, which are subject to the same law, from similar enforcement actions, fines, and penalties.

9.      Defendants' administration of the Idling Law, through the imposition of fines and penalties, also threatens Plaintiffs' ability to operate profitably. Consequently, Defendants' application of the Idling Law threatens the continued delivery and viability of passenger carriage services in interstate commerce to and within New York City. [1]

---

[1] ABA conducted a nationwide survey of its members. More than three-quarters of respondents regularly or occasionally operate in New York City, making them the most directly affected population in the industry. Among that group, operational changes are already underway. Approximately 35% have reduced the number of trips to New York City. Another 20% have outright declined specific charters or contracts. A smaller but significant share—roughly 10%—has stopped or nearly stopped NYC operations entirely.

The reasons are consistent across company size and geography: citations that arrive months or years after the alleged violation, leaving operators no ability to investigate or mount a defense; a citizen complaint system that requires no

10.     Plaintiffs challenge Defendants' enforcement policy because it denies equal protection and due process and, as applied in the circumstances alleged herein, penalizes idling that may be reasonably necessary to complete federally required safety checks to prepare a commercial passenger motorcoach for lawful operation. This conflicts with "FMCSA" safety regulations and procedures ("FMCSRs") and forces Plaintiffs to choose between violating the Idling Law and failing to comply with FMCSA safety regulations and procedures.

11.     Plaintiffs allege that Defendants:

(a) selectively enforce the Idling Law and CAC/OATH monetary-penalty regime against private FMCSA-regulated motor carriers while shielding city- and state-owned public fleets from equivalent monetary enforcement.

(b) administer a bounty-driven complaint system that financially rewards private complainants when penalties are imposed.[2]

(c) impose recurring fines, defense costs, stipulation pressure, and operational burdens on Plaintiffs' interstate motorcoach services. and

(d) thereby distorting competition and burdening interstate passenger transportation to, from, and through New York City.

12.     In this case, Plaintiffs challenge Defendants' policies and practices that subject private interstate bus operators to unequal monetary enforcement and adjudicatory burdens, in

---

verification and cannot be challenged with contemporaneous evidence; and the physical impossibility of complying with a three-minute idling limit during passenger boarding, ADA lift operation, and federally mandated pre-trip inspections. See Exhibit 3, American Bus Association study, "Tourism at Risk." Plaintiff Exhibit 1

[2] Policymakers have not fully evaluated the legality or wisdom of outsourcing enforcement entirely to privately motivated citizens. In 2023, it is believed that 99.7% of anti-idling tickets were issued by the CAC. The profit motive behind the bounty program skews enforcement priorities and leads to arbitrary actions. For example, the MTA's bus subsidiaries and non-emergency city vehicles are shielded from civil penalties, so citizen "bounty hunters" target only a small portion of buses operated by private firms. These private buses are equally part of "mass transportation" as those owned by the MTA and often use the same bus models. However, bounty hunters focus solely on buses operated by private companies. Plaintiff Exhibit 2

4

violation of the Equal Protection Clause, the Due Process Clause, the Commerce Clause, and 42 U.S.C. § 1983.

13.    Plaintiffs are entitled to relief, jointly and severally, because their claims arise from Defendants' typical actions—specifically, the application and enforcement of the NYC Idling Law, including the CAC program and related OATH procedures, as applied to and enforced against Plaintiffs' interstate motor coach operations in New York City.

14.    Defendants have implemented and enforced regulatory measures, policies, and practices that:

- (e) Targets private interstate bus operators while shielding public carriers and non-exempt City vehicles.

- (f) Imposes illegal restrictions on access to New York City,

These actions violate:

- The Equal Protection Clause of the United States Constitution.

- The Due Process Clause of the United States Constitution.

- Plaintiffs' rights under 42 U.S.C. § 1983; and

- Applicable federal and state laws protecting against unlawful interference with business operations.

15.    Section 24-163, as applied and enforced by Defendants, prohibits idling for more than three minutes, subject to stated exceptions; imposes a one-minute limit in specified school and park-adjacent areas; and enforces a zero-tolerance idling rule at terminal points. The statute exempts legally authorized emergency vehicles from its prohibitions but does not create a public ownership carveout for enforcement, as reflected in DEP's published CAC guidance and in DEP's enforcement of the Law.

## II. PARTIES
### A.  Plaintiffs

16.    Plaintiff American Bus Association ("ABA") is a nonprofit trade association whose members are FMCSA-regulated passenger motor carriers that provide interstate passenger service to various points throughout the United States, including New York City. ABA brings this action on its own behalf and associationally, on behalf of members directly affected by the challenged enforcement policies, whose interests are germane to ABA's organizational purpose, and for whom the requested declaratory and injunctive relief does not require the participation of every individual member.

17.    ACADEMY EXPRESS LLC., ACADEMY LINES LLC, PANORAMA TOURS INC, PETER PAN BUS LINES, TRANS-BRIDGE LINES INC, ADIRONDACK TRANSIT LINES INC, HAMPTON JITNEY INC, LEPRECHAUN LINES INC., NIAGARA SCENIC TOURS, INC, BUS COMPANY HOLDINGS US LLC dba COACH USA, AND GREYHOUND LINES INC (collectively, the "Plaintiffs") are FMCSA-regulated motor carriers authorized to transport passengers for hire in interstate commerce across the United States. This includes regular-route commuter operations between New York City and other states, charters, contract carriage, international touring, and other passenger motorcoach services to and from New York City. In the normal course of their operations, Plaintiffs' motor coaches enter the City, use public streets and curb spaces, and stop to load, unload, and service passengers.

18.    Each Plaintiff is an ABA member and operates scheduled transit and/or charter motor coach passenger service that requires entry into movement within New York City and includes service stops in New York City, using the same streets, bus stops, and public curb locations as public entity motor carriers operating passenger transportation services in New York City.

6

19.    Each Plaintiff has been, is being, or faces a credible threat of being subjected to the challenged CAC/OATH enforcement policies, resulting in economic and operational harm.

## B. Defendants

20.    "Defendant City of New York" is a municipal corporation organized under New York State law.

21.    The New York City Department of Environmental Protection ("DEP") is a city agency responsible for enforcing environmental laws and regulations in New York City. Defendant Lisa F. Garcia, the Commissioner of the DEP, is sued in her official capacity.

22.    At all relevant times, the challenged "Citizen's Air Complaint Program" ("CAC") enforcement practices, including how city and state vehicles were treated under DEP's published guidance, constitute official municipal policy, custom, or practice implemented under color of state law.

## III. JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this case involves the United States Constitution and 42 U.S.C. § 1983.

24.    The Court has supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367.

25.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside here and a substantial part of the events giving rise to the claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

26.    Defendants administer New York City Administrative Code § 24-163 through DEP and CAC, under which private citizens, "bounty hunters," submit idling complaints that can lead to OATH prosecutions and monetary penalties.

7

27.    DEP's official CAC guidance states that city and state vehicles, including MTA/TA buses, are "subject to the idling regulations," but that a summons issued to them is to be "administratively dismissed" and "no monetary penalty collected." The City's announced public policy is,

**"Are there any situations where a respondent does not have to pay the penalty?**

"City and state vehicles, including MTA/TA buses, are subject to the idling regulations, but a summons is administratively dismissed, and no monetary penalty is collected." See. Citizens Air Complaint Program, NYC Department of Environmental Protection, https://www.nyc.gov/site/dep/environment/idling-citizens-air-complaint-program.page

On the DEP website, the Commissioner publicly and formally advises citizens:

"**What vehicles can a Citizen file an idling law complaint against?**

"City and/or state vehicles are not subject to OATH penalties."
(See. Citizens Air Complaint Program, NYC Department of Environmental Protection https://www.nyc.gov/site/dep/environment/idling-citizens-air-complaint-program.page)

28.    DEP's official public CAC guidance enforces the Commissioner's unsupported application of the Idling Law, which prohibits OATH from prosecuting City vehicles that violate the Law, and asserts, contrary to the text of the statute, that **"[c]ity and/or state vehicles violating the Idling Law are not subject to OATH penalties."**

29.    The Idling Law regulates idling by non-exempt commercial and publicly owned motor vehicles in New York City.

30.    The City's public statements regarding CAC enforcement are consistent with and evidence of that policy.

31.    Plaintiffs operate combustion-engine passenger motorcoaches in New York City as part of interstate passenger transportation.

32.    City-, state-, and publicly affiliated fleets also operate non-emergency combustion-engine buses and heavy-duty non-exempt idling-law vehicles in New York City.

8

33.    Plaintiffs and those public fleets use public streets, curb space, loading zones, staging areas, and terminal points, and are similarly situated in material respects relevant to enforcing § 24-163.

34.    On information and belief, publicly owned fleets operate significantly more combustion-engine vehicles in New York City than Plaintiffs operate.

35.    Section 24-163 does not provide a general exemption for non-emergency city- or state-owned vehicles, nor does it shield against enforcement or monetary penalties based on whether the vehicle is publicly or privately owned.

36.    DEP's enforcement policy reflects a public/private ownership-based policy not found in the text of § 24-163.

37. Nevertheless, private carriers are subject to CAC/OATH monetary enforcement, whereas city and state fleets are administratively exempt from OATH monetary liability under DEP's published policy.

38.    By contrast, Plaintiffs and similarly situated private interstate carriers are:

- Required to defend CAC summonses before OATH.

- Subjected to monetary penalties upon adjudication.

- Denied the benefit of administrative dismissal; and

- Exposed to escalating financial liability for repeated alleged violations.

39.    This disparity in enforcement is systemic, consistent, and ongoing, resulting in a two-tier enforcement regime.

- One applicable to private interstate carriers, involving investigation, prosecution, defense, and investigative costs, as well as monetary penalties; and

9

- One applicable to publicly owned or affiliated fleets, involving non-enforcement through administrative dismissal of vehicles expressly subject to the idle law.

40. Upon information and belief, disparate treatment is carried out pursuant to formal or informal policies that are approved, implemented, ratified, or knowingly tolerated by final DEP policymakers.

41. This disparity in treatment is systemic and ongoing, creating a two-tier enforcement regime: one for private carriers, involving summonses, adjudication, stipulation pressure, and monetary penalties; and another for city and state fleets, involving administrative dismissal by OATH and monetary penalties.

42. On information and belief, such administrative dismissals are carried out at the direction of or with the approval of the Commissioner of DEP, or in accordance with policies and practices adopted and ratified by that office.

43. Consequently, Defendants enforce the statute unevenly across public and private fleets in New York City.

44. Under the CAC program, private individuals can file complaints about violations of the Idling Law. These complaints may result in monetary penalties enforced through OATH proceedings. A percentage of the fines and penalties recovered under the CAC program is paid to the complainant.

45, As a result of the challenged regime, private motor carriers, including Plaintiffs, incur fines, stipulation payments, attorney time, hearing costs, and operational burdens that are not imposed on city and state fleets through the same OATH monetary process.

46.    For example, from January 2020 through March 2025, Academy Express LLC and Academy Lines LLC attended OATH hearings on CAC matters and were offered stipulations totaling approximately $243,593, of which approximately $241,509 was paid.

47.    As of March 18, 2026, the Academy Plaintiffs faced approximately $768,093 in aggregate exposure from tickets or stipulations issued by CAC/OATH enforcement.[3]

48.    Upon information and belief, since at least 2020, Defendants have issued thousands of CAC summonses against private motorcoach and interstate transportation companies operating in New York City.

49.    Those fines and associated administrative burdens significantly increase the cost of providing interstate passenger transportation to, from, and through New York City.

| | Tickets issued | |
| --- | --- | --- |
| | Stipulations offered | Amount paid so far |
| Hearings 1/2020 thru 3/2025 | $243,593.00 | $241,509.00 |
| Hearings 4/2025 thru 7/2026 | $524,500.00 | $ 36,898.00 |
| Totals as of 3/18/26 | $768,093.00 | $278,407.00* |

*The numbers above do not include attorney fees or recent court appearances as they are not updated yet.

50.    These summonses have led to significant financial penalties imposed by the Defendants, including fines, fees, and related administrative costs.

51.    Motor coach transportation provides significant passenger capacity and congestion-reduction benefits, yet the enforcement regime's challenges burden a transportation

---

[3] Schedule of CAC summons issued to Plaintiff's Academy Express LLC and Academy Lines LLC. Plaintiff Exhibit 3

mode that serves interstate mobility and tourism. Therefore, Plaintiffs are not the problem. Plaintiffs are part of the solution to achieving lower emissions in New York City.

52. As a direct result of the challenged enforcement disparity, Plaintiffs have incurred significant fines, legal expenses, operational difficulties, and a competitive disadvantage.

53. These burdens are especially significant because Plaintiffs' interstate motorcoach operations depend on continued access to New York City streets, curb space, terminals, loading zones, and staging areas to serve the commuting public.

54. On information and belief, the City Council is considering legislation that would substantially increase fines for idling violations under the CAC enforcement regime. The proposed increases would raise fines from $350 to $2,000 for a first offense, from $1,000 to $2,000 for a second offense, from $2,000 to $4,000 for a third offense, and from $3,000 to $6,000 for a fourth offense.

55. The substantially higher idling penalties would put significant pressure on the continued use of diesel motorcoaches for travel to and from New York City and on the private carrier's ability to provide passenger transportation to New York City.

56. In CAC proceedings before OATH, Plaintiffs are subjected to an administrative adjudication process that imposes or facilitates monetary penalties, while, as a practical matter, constitutional objections to the legality of the enforcement regime are not fully adjudicated in that forum.

57. Plaintiffs are therefore required to incur additional expenses and delays to pursue judicial review of constitutional objections outside the OATH process.

58.     FMCSA regulations require drivers and motor carriers to ensure that a commercial motor vehicle is in a safe operating condition before driving and require safety inspection reports. (See 49 C.F.R. §§ 396.11, 396.13).

59.     Federal regulations also require drivers to inspect commercial motor vehicles and prepare driver vehicle inspection reports that identify defects or deficiencies that could affect safe operation or cause mechanical failure. See 49 C.F.R. § 396.11. These inspections cover safety-related components, including brakes, steering, tires, lights, mirrors, windshield wipers, and emergency equipment. [4]

60.     In practice, certain pre-trip, loading, unloading, staging, accessibility, and operational checks for motorcoaches may require the engine to remain running long enough to power or test essential systems, including brakes, lights, doors, HVAC, wheelchair-lift equipment, electrical systems, and other onboard systems.

61.     In some circumstances, a motorcoach may need the engine running to maintain or restore system pressure or to ensure readiness for safe operation before returning to service.

62.     Diesel motorcoaches use engine-driven regeneration to maintain exhaust system operation. In some cases, emission-related regeneration occurs while a vehicle is parked and running.

63.     The regeneration process is not controlled by the driver but by a computer program designed by the engine manufacturer to reduce engine emissions. It is computer-initiated and depends on the buildup of particulate matter from engine operation.

---

[4] See. FMCSA Driver Vehicle Inspection Report Plaintiff Exhibit 4

64.     As applied in those circumstances, Defendants' enforcement regime can penalize conduct that Plaintiffs allege is reasonably necessary to comply with federal safety obligations and operational requirements.

65.     As part of these procedures, drivers must inspect and test safety-related systems and components, such as lights, brakes, tires, mirrors, and emergency equipment, before transporting passengers.

66.     The engine powers and supports various systems in standard motor coach operations, including doors, kneeling functions, luggage bay systems, electrical systems, and some passenger-service equipment. These systems include, among other things, brakes, lights, windshield wipers, HVAC, wheelchair-lift equipment, and related onboard systems.

67.     At the core of the issue is the City's Idling Law, which fails to account for the operational and safety needs of modern motor coaches under FMCSA regulations.

68.     Unlike private vehicles, buses must keep their engines running when occupied or when preparing to board to power essential systems, including HVAC, air brakes, and onboard safety equipment.

69.     As a result, drivers cannot always shut down the engine immediately upon arrival or complete all safety operational checks with the engine off.

70.     In practice, these safety, operational, and equipment-related requirements may require the engine to run or idle for periods that can exceed the Idling Law limits in certain locations or circumstances.

71.     Oath improperly precludes all idling at terminal points by interpreting section 24-163(a) as imposing strict liability for any detectable engine operation when the ambient temperature exceeds 40 degrees F, in direct conflict with FMCSA safety regulations.

72.    In Appeal Nos. 2501270, 2501271, and 2501272 (DEP Academy Express LLC, December 18, 2025) (DEP v Academy Bus, Dec 18, 2025, Appeal No. 2501269), the Board expressly held that "buses cannot idle for any amount of time at a terminal point" and affirmed idling violations lasting as little as 1:33 and 1:48.[5]

73.    This zero-tolerance policy directly conflicts with FMCSA safety regulations and procedures that require brake pressure testing (49 C.F.R. 383.113; 392.7; 393.52; 396.13) and power system checks after any stop. These rulings eliminate any meaningful safe harbor for the brief engine operation that FMCSA regulations require.

74.    Motorcoach transportation is a vital component of interstate passenger travel and regional mobility. The motorcoach industry generates $158 billion in economic impact annually, supports more than 800,000 jobs, and contributes $27 billion in federal, state, and local taxes nationwide, making it a crucial part of America's transportation and tourism systems.

75    New York City's existing regulations on private motor coaches endanger a significant, proven contributor to the state and city's economy and conflict with federal transportation law.

76    Plaintiff Academy Express LLC sought a variance from DEP, but the variance DEP offered contained conditions that Academy deemed operationally inadequate and inconsistent with its service and safety requirements.

77.    Plaintiffs allege that the challenged regime is being used not merely to regulate emissions but also to impose ownership-based and operationally unrealistic burdens on private carriers.

---

[5] See Plaintiffs' Exhibits 5 and 6

78.     Upon information and belief, Defendants seek, through the CAC program and the imposition of substantial fines and penalties on private motor carriers, to force private carriers to convert their diesel-powered fleets to electric fleets in order to continue operating in New York.

79.     Such a conversion would require significant capital investment and would depend on the availability of vehicles, charging infrastructure, maintenance support, and operating conditions that are not yet comparable to those of traditional diesel fleets. Electric motor coaches have also proven unreliable, extremely expensive, and limited in range and operational capability.

80.     Notably, the electric charging infrastructure needed to support electric motorcoach fleet operations in New York is limited, impractical, or nonexistent. Electric motorcoach performance in operation is significantly less reliable; battery degradation occurs and is largely unpredictable; extreme weather conditions can adversely impact operations; maintenance costs are much higher; new electric buses cost about three times as much as similarly equipped diesel motorcoaches; manufacturer warranties on batteries are more limited; and residual value for used electric buses is minimal because of these negative factors. Nevertheless, the Defendants' apparent goal is to transition all private fleets in the City of New York to electric.

**CLAIMS FOR RELIEF**

**FIRST CLAIM**
**Equal Protection Clause – Selective Enforcement**
**42   U.S.C. § 1983**
**(Against All Defendants)**

81.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein and make the same a part hereof.

82.     This claim is brought under 42 U.S.C. § 1983 for the deprivation, under color of state law, of rights secured by the Fourteenth Amendment's Equal Protection Clause. Defendants

have adopted and enforced an ownership-based CAC/OATH monetary enforcement policy that treats private carriers differently from similarly situated city and state fleets.

83.    Plaintiffs are private operators of non-emergency passenger buses powered by internal combustion engines in New York City.

84.    City and state fleets, including MTA/TA buses as described in DEP's published guidance, operate non-emergency buses or heavy-duty vehicles within the same jurisdiction and are similarly situated in material respects relevant to the enforcement of § 24-163.

85.    Defendants have adopted, announced, implemented, and enforced a policy under which private carriers are subjected to CAC/OATH monetary enforcement, while city and state fleets are administratively dismissed from that enforcement.

86.    That differential treatment turns on public/private ownership status rather than on any material difference in vehicle type, operational setting, or statutory text.

87.    DEP's published statements that city and state vehicles are "subject to the idling regulations" but are administratively dismissed and not subject to OATH penalties reflect an official policy of unequal enforcement.

88.    Section 24-163 does not authorize Defendants to create a public/private ownership carveout from OATH monetary penalties for non-emergency city and state fleets.

89.    Plaintiffs and public fleets are similarly situated in material respects because they operate combustion-engine vehicles in New York City, use the same streets and curb space, engage in substantially similar loading, unloading, staging, and stop-related conduct, and, on the face of the statute, are subject to the same idling restrictions unless a valid statutory exemption applies.

90.     Upon information and belief, during the relevant period, Defendants issued more than 4,000 CAC summonses to private motor carriers, including Plaintiffs and other similarly situated interstate transportation companies that provide passenger service to New York City.

91.     In contrast, CAC summonses issued to publicly owned, municipally affiliated, or politically favored fleet operators by private citizen "bounty hunters" are routinely dismissed administratively without adjudication, penalties, adverse findings, or fines.

92.     Public and government-affiliated fleet operators are similarly situated to Plaintiff in all material respects, including but not limited to:

- Operation of commercial vehicle fleets is subject to the same CAC provisions.

- Engagement in substantially identical passenger transportation activities.

- Operation within the same geographic and regulatory jurisdiction.

- Despite this equivalence, Defendants have consistently declined to enforce CAC penalties against such public or favored entities.

93.     The selective enforcement scheme is a deliberately adopted public policy, not the result of random errors or isolated discretion, and is not a permitted exclusion to enforcement under the Idling Law.

94.     Defendants lack a rational basis for imposing recurring monetary penalties on private carriers while shielding similarly situated city and state fleets from comparable OATH monetary enforcement.

95.      Alternatively, Defendants' differential treatment is motivated by favoritism, protectionism, revenue-generating incentives, hostility toward private interstate carriers, or a desire to confer regulatory and economic advantages on publicly owned or preferred fleets.

Defendants' actions lack any rational basis and are undertaken to confer economic and regulatory advantages on public-sector or politically favored operators.

96.    Defendants' enforcement policy imposes disproportionate burdens on private interstate carriers, threatening the carriers' ability to continue delivering interstate and intrastate passenger service to New York City. [6]

97.    As a direct result, Plaintiffs have experienced unequal treatment under the law, violating the Equal Protection Clause of the Fourteenth Amendment.

98.     Defendants' conduct violates the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs request judgment against Defendants on Count I, along with declaratory and injunctive relief, damages for loss, attorneys' fees, and costs under 42 U.S.C. § 1988, and such other relief the Court deems appropriate.

**SECOND CLAIM**
**Procedural Due Process**
**42 U.S.C. § 1983**
**(Against All Defendants)**

99.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein at length and make the same a part hereof.

100.     This claim is brought under 42 U.S.C. § 1983 to address the deprivation, under color of state law, of rights protected by the Fourteenth Amendment's Due Process Clause.

101.     Plaintiffs possess protected property interests in their money, business assets, and ongoing business operations, including freedom from unconstitutional monetary penalties and coercive settlements imposed by an unfair enforcement regime.

---

[6] See. ABA NYC Idling Survey Report Plaintiffs Exhibit 1

102. In CAC proceedings before OATH, Defendants subject Plaintiffs to an administrative process that unfairly and prejudicially determines alleged liability and imposes monetary penalties.

103. Under the CAC program, an issuing officer, who never personally observed the alleged idling incident that gave rise to the alleged violation, affirms the citizen "Bounty Hunter" complaint under penalty of perjury, relying solely on the accompanying short phone video clip supporting the complaint. The burden of proof then immediately shifts to the respondent to refute the complaint and to prove an affirmative defense by a preponderance of the evidence.

104. Meanwhile, the City relies on citizen-submitted video that may lack operational context, including context for loading, unloading, staging, accessibility procedures, equipment testing, and other legitimate motor coach activity.

105. The citizen's phone video clip is generally a short recording with a limited field of view. Was the bus idling to prepare to accept passengers? Was the driver running an FMCSA safety test? Was it idling due to regeneration (which is computer-controlled to reduce engine emissions, over which the driver has no operational control and can occur at any time)? Was the driver seeking to maintain an ambient temperature for the passengers due to severe cold or heat? The entire process, "outsourcing" police power to private citizens motivated to collect fines; an unfair and predetermined adjudication process (prima facie summons, plus bounty, no meaningful cross-examination); is applied in an arbitrary and inconsistent manner to deprive Plaintiffs of their constitutionally protected rights.

106. OATH convictions are based on the permissive use of short video clips, reviewed and approved by an Issuing Officer not present at the time of the alleged event and has no

firsthand knowledge of it. Defendants also routinely waive the Issuing Officer's attendance at the hearing.

107.    The produced video includes an editable timestamp and is often cropped to omit loading, unloading, and safety-check context. Defendants collect the contact information for the issuing officer and the citizen complainant and notify them that "you may need to testify." Defendants routinely waive the issuing officer's appearance and almost never call the citizen complainant to testify at the hearing.

108.    Consequently, there is no absolute right to confront and cross-examine witnesses. OATH requires the respondent to make a specific offer of proof showing that cross-examination could materially affect the outcome of the case, a condition precedent to requiring the witness's appearance and cross-examination (See DEP v TSU Global Services Inc., Appeal No. 2300801).

109.     The OATH rules permit Plaintiff's summons to be admitted as prima facie evidence of the violation (see 48 RCNY section 6-12(b)).

110.    The prima facie asymmetry imposed under 48 RCNY section 6-12(b) strongly favors the Plaintiff, who is not required to appear to offer testimony or be subjected to cross-examination, and disfavors the Defendants, who are prejudiced.

111.    The Respondent in the proceedings has no meaningful opportunity to cross-examine the Plaintiff, because the Plaintiff's generally mandated court appearance to prove the elements of the cause of action pleaded in his complaint is not required for conviction.

112.    Respondent is also severely restricted by limited discovery and substantial delays in Defendants' notification and service of summons. As a consequence, carriers are

confronted with drivers' fading memories of the event due to substantial delays in process service, resulting in lost opportunities to identify and develop defense witnesses.

113.    Respondents are prejudiced by this requirement because the substantial delay in Defendants' service of the summons, which often occurs six months to a year after the alleged incident, substantially hampers respondents' ability to investigate the allegations, identify the driver, locate potential witnesses, and reconstruct the circumstances that may have led to the alleged idling.[7] Because notice is delayed, Plaintiffs often cannot preserve or retrieve contemporaneous exculpatory evidence, including electronic data, dispatch records, internal video, and witness recollections.

114.    Nor is the respondent permitted to conduct full discovery. Discovery is limited by 48 RCNY Section 6-07 to the witness list and the documents DEP intends to use at the hearing to prosecute the case (primarily the video clip and the complaint).

115.    Defendants, through the CAC program, routinely delay service of summonses for alleged idling violations for months after the alleged violations occur.

116.    Upon information and belief, those delays typically range from approximately six to twelve months.

117.    Plaintiffs' records, including examples from Academy Express LLC and Academy Lines LLC, show repeated delays between the alleged violation dates and the service dates.[8]

118.    These delays are systemic and recurring, not isolated.

6 See Plaintiffs' Exhibit 5

7. See Plaintiff's Exhibit 6

119.    Federal regulations require motor carriers to retain records of duty status and support documents for six months. See 49 C.F.R. § 395.8(k)(1).

120.    In addition, Plaintiffs allege that telematics, GPS, engine, and related vehicle data are routinely overwritten in the ordinary course of business before delayed summonses are served.

121.    The result is substantial prejudice to Plaintiffs' ability to investigate and to defend against the allegations.

122.    Under the circumstances alleged herein, the routine delay in service deprives Plaintiffs of a meaningful opportunity to defend themselves at a meaningful time and in a meaningful manner.

123.    The Due Process Clause requires that a party be afforded a meaningful opportunity to be heard "at a meaningful time and in a meaningful manner." In assessing whether process is constitutionally sufficient, courts consider (i) the private interest at stake, (ii) the risk of erroneous deprivation under the procedures used, and (iii) the governmental interest, including administrative burdens.

124.    As applied to Plaintiffs' private carriers, Defendants' process does not provide a meaningful opportunity to litigate the factual issues in dispute, to challenge the constitutional validity of the enforcement regime, or to challenge the deprivation of Plaintiffs' money and property.

125.    The risk of erroneous deprivation is heightened by Defendants' ownership-based public/private carveout, bounty-driven complaint incentives, and service delays that impede access to exculpatory evidence before Plaintiffs receive notice.

126.     Under the circumstances alleged herein, the process afforded is neither fair, neutral, nor meaningful.

127.     The challenged process is further rendered arbitrary and unfair by Defendants' extra-statutory public/private carveout, bounty-driven complaint incentives, and administrative practices that shield publicly owned fleets from equivalent monetary penalties while private carriers are pursued through CAC and OATH enforcement.

128.     Essentially, the OATH process has become a "legal dead end." By the time a plaintiff reaches a forum that can hear constitutional arguments (such as this District Court or a Section 78 proceeding), the property (the fine money) has already been seized, or the "record" from OATH is compromised because federal safety defenses are excluded.

129.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer unlawful monetary losses and irreparable harm.

130.     Defendants' conduct violates the Fourteenth Amendment's Due Process Clause and 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs request judgment against Defendants on Claim II, along with declaratory and injunctive relief, compensatory damages, attorneys' fees, and costs under 42 U.S.C. § 1988, and such other relief as the Court deems just and proper.

## THIRD CLAIM
### Procedural Due Process (Prejudicial Delay in Enforcement)
### 42 U.S.C. § 1983
(Against All Defendants)

131.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein at length and make the same a part hereof.

132.     Defendants, through the administration of the Citizens Air Complaint ("CAC") program, routinely delay the service and prosecution of summonses issued for alleged

24

violations of New York City Administrative Code § 24-163 by six to more than 12 months.

133.    Plaintiffs' Exhibit 3 lists the CAC summonses filed against Academy Express LLC and Academy Lines LLC. The first column shows the summons date, and the second column shows when Academy was first served with the CAC summonses by the Defendants. In each case, the service date is six months to a year or more after the summons date.

134.    These systemic delays undermine the reliability and fairness of the adjudicative process before the Office of Administrative Trials and Hearings ("OATH") in the following ways:

- Impairing accurate fact-finding by degraded or unavailable evidence.

- Preventing Plaintiffs from presenting contemporaneous records necessary to evaluate alleged violations; and

- Increasing the likelihood of erroneous determinations based on incomplete or one-sided evidence.

- These are not isolated, unusual, or nonconforming service events but typical features of the CAC program.

135.    Defendants have not implemented procedures reasonably designed to mitigate the prejudice caused by delayed enforcement, such as requiring timely service of summonses, preserving or requesting relevant electronic data upon complaint submission, or providing mechanisms to account for the routine loss of time-sensitive operational records.

136.    The prejudice to Plaintiffs caused by these service delays is compounded by federal record-keeping retention requirements. Under the Electronic Logging Device ("ELD") Mandate (49 C.F.R. § 395, Subpart B), Plaintiffs must maintain digital records of vehicle operations. However, the automated hardware and software systems used to comply with these federal rules, along with industry-standard telematics (GPS, engine, and diagnostic data), typically overwrite GPS and engine diagnostic data every 30 days and driver electronic log data every 180 days.

137.    The Federal Motor Carrier Safety Regulations, 49 C.F.R. § 395.8(k), require a motor carrier to retain driver records of duty and supporting documents for at least 6 months from the date of receipt. Because the operator is not notified in a timely manner of a CAC complaint, the operator cannot take appropriate steps to preserve the electronic record. The operator also loses the opportunity to promptly investigate and preserve evidence from the time the summons is issued.

138.    The delayed service and prosecution of CAC summonses, together with the foreseeable loss of material evidence, deprive Plaintiffs of a meaningful opportunity to be heard at a meaningful time, violating the Due Process Clause of the Fourteenth Amendment

139.    Defendants are aware of industry-standard data retention limits yet continue to use a "wait-and-purge" service strategy. This approach effectively deprives Plaintiffs of their "best evidence" defense, forcing them to rely on drivers' faded memories of operating numerous vehicles over the past year.

140.     Significantly, the Defendants face no consequences for their delays. OATH hearing officers adjudicate the CAC complaint irrespective of the delay periods, and the prejudice the Plaintiffs suffer as a result is not addressed by the Court.

141.     The prejudicial effects of delayed enforcement are compounded by the CAC program's structure, which incentivizes private complainants to submit allegations without corresponding obligations to preserve or provide complete evidentiary context, thereby increasing the risk of incomplete or unbalanced records at the time of adjudication.

142.     Upon information and belief, the City knows that private carriers rely on this digital evidence and is fully aware of the extended delay in serving CAC summons. Given the City's awareness of these issues, the service delays cannot be anything other than deliberate.

143.     The requirements of due process depend on the nature of the interest at stake and the weight of that interest, balanced against the government's opposing interests. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. In this case, the City prosecutes when the data becomes unrecoverable and exculpatory evidence is lost and unavailable, effectively shifting the burden of proof onto the Plaintiff.

144.     The City is intentionally bypassing the Plaintiff's "best evidence" in favor of "Citizen Video," which is often edited, grainy, or lacks context about the bus's mechanical needs (such as air-pressure buildup) and about passenger loading and unloading.

145.     As a direct result of these delays, Plaintiffs are seriously prejudiced in their ability to investigate and defend against the allegations, including but not limited to the following:

- the inability of drivers to remember the specific details of the alleged incident due to the long delay.

- the inability to identify the driver responsible for a specific alleged violation.

- the loss or overwriting of current business records, including telematics data, GPS logs, dispatch records, and onboard video, in the normal course of business.

- the unavailability of witnesses and supporting evidence.

- the inability to effectively challenge selective and incomplete video submissions from citizen complainants.

146.     These delays significantly undermine the accuracy, reliability, and fairness of the adjudication process before the New York City Office of Administrative Trials and Hearings ("OATH")

147.     Defendants have not implemented sufficient safeguards to mitigate the prejudice caused by delayed enforcement, including the need for prompt service and evidence preservation.

148.     The delayed enforcement regime violates fundamental due process principles, including the right to a fair opportunity to be heard at an appropriate time.

149     Unlike typical administrative delays, the CAC structure:

a.  Couples delay with bounty-driven enforcement incentives, and

b.  Shifts the evidentiary burden onto defendants who are deprived of timely access to exculpatory evidence.

150.    Taken together, the delayed service of summonses, the predictable loss of exculpatory evidence, and the structure of the CAC enforcement regime create a constitutionally deficient process that fails to afford Plaintiffs a fair and meaningful opportunity to defend against alleged violations.

151.    The prejudice described herein is foreseeable and systemic, given the known industry record-retention limitations and Defendants' consistent delays in service, yet Defendants have not adopted procedures to mitigate such prejudice.

152.    This process supports an unconstitutional deprivation of procedural due process under the Fourteenth Amendment.

WHEREFORE, Plaintiffs request judgment against Defendants on Count III, together with declaratory and injunctive relief, damages for loss, attorneys' fees, and costs under 42 U.S.C. § 1988, and any other relief the Court deems appropriate.

## FOURTH CLAIM
## 42 U.S.C. § 1983 – Substantive Due Process
(Against All Defendants)

153.    Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs as though set forth herein at length and make the same a part hereof.

154.    Defendants have engaged in arbitrary and irrational enforcement conduct by aggressively prosecuting CAC violations against private carriers while simultaneously nullifying enforcement actions against public-sector entities through administrative dismissal.

155.    Effectively, the City has outsourced its police power to profit-seeking private individuals, leaving it without oversight.

156.     The striking difference in enforcement outcomes—thousands of penalties for private carriers versus dismissals for public fleets—reflects conduct that is deeply shocking and inherently unfair.

157.     Defendants' enforcement scheme is arbitrary, irrational, and conscience-shocking because it:

- encourages profit-driven enforcement by private citizens.
- imposes punitive consequences disconnected from legitimate regulatory objectives.
- disproportionately burdens interstate carriers. and,
- operates as a revenue-generating mechanism rather than a scheme narrowly tailored to any legitimate governmental purpose.

158.     Such conduct violates substantive due process.

159.     Defendants' actions are not justified by legitimate government goals and instead reveal favoritism, bias, and improper policy considerations.

160.     The lack of enforcement against non-exempt vehicles in public fleets, which are subject to the same Idling Law, shows that the City's goal is not about "clean air" (since a city vehicle pollutes as much as a private coach, and given the number of vehicles the City operates, actually more), but about generating revenue. If the goal were environmental, the owner of the fleet would not matter in any prosecution regarding emissions.

161.     As a direct result, Plaintiffs have been deprived of their right to fair and impartial government treatment, violating substantive due process.

WHEREFORE, Plaintiffs request judgment against Defendants on Claim IV, together with declaratory and injunctive relief, compensatory damages, attorneys' fees, and costs under 42 U.S.C. § 1988, and any other relief the Court deems just and proper.

**FIFTH CLAIM**
**Dormant Commerce Clause**
**42 U.S.C. § 1983**
**(Against All Defendants)**

162. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

163.. Plaintiffs bring this claim under 42 U.S.C. § 1983 to enforce rights secured by the United States Constitution's Commerce Clause.

164. Plaintiffs are interstate motor carriers engaged in transporting passengers across state lines, including regular operations into and out of New York City.

165. The Commerce Clause prohibits state and local laws and enforcement practices that discriminate against interstate commerce or that impose burdens on interstate commerce that are excessive relative to putative local benefits.

166. Defendants' CAC enforcement practices impose substantial financial and operational burdens on private interstate motor carriers.

167. At the same time, Defendants' policies shield publicly owned or affiliated fleets from comparable monetary penalties through administrative dismissals.

168. This differential treatment alters the competitive conditions under which interstate carriers operate in New York City.

169. This imbalance:

- Raise the operating costs for interstate carriers.

- Shields local and public competitors from equivalent regulatory burdens.

- Distorts market competition within the jurisdiction.

170. The burdens imposed by Defendants' enforcement practices are substantial, including recurring fines, administrative costs, and operational constraints.

171.    In practice, the enforcement regime favors public or locally affiliated transportation providers over private interstate carriers.

172.    The cumulative effect of repeated monetary penalties and enforcement costs significantly increases the cost of operating interstate passenger services in and around New York City.

173.    To the extent Defendants assert local environmental or regulatory interests, those interests can be advanced through nondiscriminatory enforcement of the Idling Law.

174.    Defendants' current enforcement practices impose burdens on interstate commerce that are disproportionate to any legitimate local benefit.

175.    Less discriminatory and more uniform enforcement alternatives are readily available. The enforcement scheme functions as a de facto protectionist measure, favoring in-state or publicly affiliated entities over private, interstate participants.

176.    The challenged enforcement regime increases costs for interstate carriers while conferring relative economic advantages on publicly owned or affiliated fleets.

177.    This differential treatment distorts competition in New York City's passenger transportation market.

178.    The resulting burden on interstate commerce is both substantial and persistent.

179.    The cumulative weight of these fines functions as a 'tax' on entering New York City, which does not apply to local municipal fleets. The fines of $350–$2,000+ create a price-floor disadvantage for interstate carriers competing for contracts against local or "shielded" entities.

180.    At the same time, the enforcement regime used by Defendants confers a relative economic advantage on publicly owned or favored fleets by shielding them from comparable OATH monetary penalties under the same facially applicable law.

181.    As alleged above, Defendants disproportionately impose these burdens on private interstate carriers, while publicly owned or affiliated fleets are protected from monetary penalties through administrative dismissal of summonses.

182.    This differential enforcement results in practical discrimination against interstate commerce in the following ways:

- Increasing the operating costs for interstate carriers.
- Providing a financial advantage to publicly owned local transportation providers; and
- Distorting competition in the transportation market.

183.    The burdens imposed on interstate commerce are clearly excessive relative to any purported local benefit, particularly where:

- Identical or substantially similar conduct by publicly owned fleets is not penalized, and
- Less discriminatory alternatives to enforcement are available.

184.    To the extent the Defendants' enforcement regime, in practice, discriminates between private interstate carriers and public or locally protected fleets, that discrimination is not justified by any legitimate local interest that cannot be achieved through reasonable, nondiscriminatory alternatives.

185.    As a direct result of Defendants' conduct, Plaintiffs have suffered and continue to suffer pecuniary losses, competitive harm, and operational disruption.

186.        Plaintiffs are entitled to declaratory and injunctive relief. As a direct and immediate result of Defendants' actions, Plaintiffs have suffered and continue to suffer pecuniary losses, competitive harm, business disruption, and irreparable harm.

WHEREFORE, Plaintiffs request judgment against Defendants on Claim V, together with declaratory and injunctive relief, compensatory damages, attorneys' fees and costs under 42 U.S.C. § 1988, and any other relief the Court deems just and proper.

**SIXTH CLAIM**
**Supremacy Clause / Federal Preemption**
**Declaratory and Injunctive Relief**
**(Against All Defendants)**

187..        Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein at length and make the same a part hereof.

188.        Plaintiffs' operations are subject to federal motor carrier safety regulations, including those issued by the Federal Motor Carrier Safety Administration (FMCSA).

189.    These regulations require drivers and carriers to ensure that vehicles are in safe operating condition before and during operation.

190.     Federal regulations require drivers and motor carriers to ensure their vehicles are in safe operating condition and to complete mandatory inspections before driving, including those required by 49 C.F.R. §§ 396.11 (Driver Vehicle Inspection Reports) and 396.13 (Driver Inspection).

191.    In certain operational contexts, compliance with federal safety requirements requires that a motorcoach engine remain running to support essential systems, including braking, electrical, and safety functions.

192.    Defendants' enforcement of the Idling Law penalizes engine operation that may be reasonably necessary to comply with federal safety requirements.

193.    In those circumstances, motor carriers face conflicting obligations: compliance with local idling restrictions or with federal safety standards.

194.    This conflict creates an impermissible obstacle to achieving and implementing federal regulatory objectives.

195.    In practice, performing federally required pre-trip and operational safety checks for motorcoaches may require the engine to run or idle for periods that exceed the limits set by Defendants under the Idling Law in certain locations or circumstances.

196.    Specifically, federal safety standards, including 49 C.F.R. § 396.13 and 383.113, require motor coaches to be equipped with air-actuated service brake systems. To ensure safe stopping distance and prevent brake failure, these systems must maintain specified pressure levels, typically between 100 and 125 psi.[9]

197.    After a temporary stop for loading, unloading, or staging, a motorcoach engine often must remain running to maintain or restore the air pressure needed for safe travel. Under federal safety rules, a driver cannot operate a vehicle if it is likely to cause an accident or breakdown.

198.    To the extent Defendants impose penalties for conduct reasonably necessary to comply with federal safety obligations, such enforcement is preempted by the Supremacy Clause.

199, Federal law occupies the field of motor carrier safety to the extent necessary to ensure uniform safety standards for interstate transportation.

---

[8] FMCSA in-cab air brake tests require a 7-step process: safe start, air compressor governor check, air leakage rate test, low-air warning signal check, spring brake pop-out test, and parking/service brake tug tests to ensure the air systems operate safely within specified limits (49 CFR 383.113 and 49 CFR 393).

200.  Defendants' enforcement practices interfere with federal objectives by penalizing conduct essential to safe vehicle operation.

201.  Plaintiffs do not challenge the Idling Law on its face but instead challenge its enforcement when it conflicts with federal safety requirements.

202..  The enforcement of the Idling Law by defendants creates an "impossible compliance" trap: a driver who idles for more than three minutes to ensure the air-brake system reaches federally mandated safety pressures faces a City penalty, while a driver who shuts off the engine to avoid a City penalty risks operating the vehicle with insufficient air pressure, thereby violating federal safety law. 49 CFR 392.7 prohibits driving a commercial vehicle unless the driver is satisfied that the service brakes, trailer brake connections, and parking brakes are in good working order.

203.   Because the CAC enforcement regime penalizes conduct that is physically necessary to comply with the Federal Motor Carrier Safety Regulations (FMCSRs), it obstructs the achievement and implementation of Congress's full purposes and objectives in interstate motor carrier safety and is therefore preempted by those regulations.

204.   49 C.F.R. § 392.7 (Equipment, Inspection and Use) requires drivers to ensure that equipment, such as air brakes, functions properly. Air brake systems require the engine to run to maintain pressure. The engine also powers all other major systems in motor coaches, including lifts, air conditioning, heating, regeneration, GPS, lights, and similar features.

205.  The City's enforcement forces drivers to choose between a Federal Safety Violation (such as moving a bus with insufficient air pressure) and a City Idling Violation, an impossible choice. Under the Supremacy Clause, federal law must prevail.

36

206    Imposing CAC/OATH penalties for conduct reasonably necessary to comply with federal motor-carrier safety requirements conflicts with federal law and obstructs Congress's goals in regulating interstate motor carriers.

207.    To that extent, the Supremacy Clause preempts the challenged enforcement regime.

208.    Plaintiffs lack an adequate remedy at law to prevent ongoing enforcement that conflicts with federal law.

209.    Plaintiffs are entitled to declaratory and injunctive relief enjoining enforcement.

WHEREFORE, Plaintiffs request judgment against Defendants on Claim VI, declaring the challenged enforcement regime preempted to the extent of any conflict, enjoining its further enforcement in that manner, and awarding such other relief as the Court deems just and proper.

**SEVENTH CLAIM**
**Municipal Liability**
**Monell v. Department of Social Services**
**42 U.S.C. § 1983**
**(Against Defendant City of New York)**

210.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein and make the same a part hereof.

211.    The constitutional violations alleged herein were caused by the City of New York's official policies, practices, and customs.

212.    These policies include administering the CAC program and handling enforcement actions against distinct categories of vehicle operators.

213.    Defendants have publicly articulated enforcement practices under which certain categories of vehicles are not subject to monetary penalties in OATH proceedings.

37

214.    These practices are implemented consistently and reflect decisions made by final policymakers in the Department of Environmental Protection.

215.    The enforcement pattern described herein is widespread and persistent. The City has continued these practices despite the foreseeable risk of constitutional violations.

216.    These policies include, but are not limited to:

- The systematic issuance of CAC private carriers.

- The routine administrative dismissal of summonses issued to public or government-affiliated fleets.

- The unequal prosecution of enforcement actions based on operator identity rather than on conduct.

217.    Upon information and belief, these policies were:

- Directed, approved, or knowingly tolerated by senior officials, including the DEP Commissioner.

- implemented consistently across numerous cases over an extended period of time.

218.    The challenged practices constitute official policy or custom within the meaning of § 1983.

219.    The City has acted with deliberate indifference to Plaintiffs' constitutional rights.

220.    The City is therefore liable for Plaintiffs' injuries.

221.    While about 95% of private CAC summonses result in fines, all public fleet summonses are dismissed through internal administrative 'voiding' before they reach an OATH hearing. This shows that the 'policy' itself is discriminatory.

222.    The pattern of more than 4,000 enforcement actions against private carriers, coupled with the absence of sustained enforcement against public fleets, constitutes a widespread and persistent practice sufficient to establish municipal liability. Defendants' failure to correct or prevent these practices demonstrates deliberate indifference to constitutional rights.

223.    The City intentionally upheld and enforced these policies and practices despite being aware of the clear and predictable risk that they would infringe Plaintiffs' constitutional rights.

224.    The City is responsible for constitutional injuries inflicted on Plaintiffs by its agencies, officials, and final policymakers.

WHEREFORE, Plaintiffs request judgment against Defendant City of New York on Claim VII, together with compensatory damages, declaratory and injunctive relief, attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief the Court deems just and proper.

**EIGHTH CLAIM**
**Declaratory Relief**
**28 U.S.C. §§ 2201 and 2202**
**(Against All Defendants)**

225.    Plaintiffs repeat and reallege each of the allegations of the preceding paragraphs as if fully set forth herein at length and make the same a part hereof.

226.    An actual controversy exists over the legality of Defendants' enforcement practices.

227.    Plaintiffs contend that these practices violate the United States Constitution and federal law.

228.    Plaintiffs are entitled to a declaration of their rights and a declaration of the illegality of Defendants' conduct.

229.    Plaintiffs face ongoing and irreparable harm without injunctive relief.

230.    Monetary damages alone are insufficient to remedy these harms

231.    The balance of equities favors Plaintiffs.

232.    The public interest supports uniform, constitutional enforcement of regulatory laws.

233.    Plaintiffs are entitled to injunctive relief that prohibits the challenged practices.

234.    Plaintiffs contend that the selective enforcement practices described herein violate the following:

- The Equal Protection Clause.
- The Dormant Commerce Clause.
- Substantive Due Process.

235.    Defendants continue to enforce the CAC regime in a discriminatory manner, causing Plaintiffs ongoing harm.

236.     Plaintiff is entitled to a declaration that Defendants' policies, practices, and customs are unlawful and unconstitutional.

**WHEREFORE, Plaintiffs request a declaration that the challenged policies and practices of Defendants are unlawful and unconstitutional, along with further relief under 28 U.S.C. §§ 2201 and 2202.**

### NINTH CLAIM
### Permanent Injunctive Relief
### (Against All Defendants)

237.     Plaintiffs repeat and reallege each and every allegation of the preceding

paragraphs as though set forth herein at length and make the same a part hereof.

40

238. Defendants challenged conduct has caused, and unless enjoined will continue to cause, Plaintiffs' immediate and irreparable harm, including ongoing financial harm, operational disruptions, competitive disadvantages, and burdens on interstate commerce operations that cannot be fully remedied by monetary damages alone.

239. Plaintiffs lack an adequate legal remedy to prevent the continued and future enforcement of Defendants' unconstitutional and preempted policies and practices, and regime.

240. Because the City enjoys Sovereign Immunity against many types of back-damages, the money lost to unconstitutional fines might never be recoverable, rendering the harm "irreparable" as a matter of law.

241. The balance of hardships favors Plaintiffs and leans decisively in their favor.

242. The public interest favors enjoining unconstitutional, discriminatory, and federally preempted local enforcement policies and practices.

243. Plaintiff faces ongoing and irreparable harm, including:

- Continued exposure to discriminatory enforcement.
- Competitive disadvantage.
- Economic losses not fully compensable by damages.

244. The Defendants have no legitimate interest in preserving an unconstitutional enforcement scheme.

245. The public interest is served by ensuring the fair, uniform, and constitutional enforcement of regulatory laws.

246. Plaintiff therefore seeks injunctive relief requiring Defendants to:

- Cease discriminatory enforcement practices.

- Apply CAC provisions equally to all similarly situated entities.
- Prohibit administrative dismissal policies that favor public-sector or politically connected operators.

247.    Plaintiffs are therefore entitled to permanent injunctive relief prohibiting Defendants from continuing to enforce the Idling Law regime through the challenged unequal, unlawful, and preempted policies and practices.

**WHEREFORE, Plaintiffs request a permanent injunction prohibiting Defendants from enforcing the challenged regime described herein, together with any other relief the Court deems just and proper.**

## TENTH CLAIM
## 42 U.S.C. § 1983 – Class-of-One Equal Protection

248.    Plaintiffs repeat and realleg each of the allegations in the preceding paragraphs as if fully set forth herein and make the same a part hereof.

249.    Plaintiffs have been intentionally treated differently from others similarly situated, namely, public and government-affiliated fleet operators.

250.    No rational basis exists for the differential treatment.

251.    This differential treatment caused Plaintiffs economic harm.

252.    Defendants' conduct violates the Equal Protection Clause.

WHEREFORE, Plaintiffs request a permanent injunction preventing Defendants from enforcing the challenged regime described herein, along with any other relief the Court finds just and proper.

## ELEVENTH CLAIM
### State Law Claim – Administrative Fairness / Arbitrary and Capricious Enforcement
### (New York Common Law / Article 78 Principles)
### (Against All Defendants)

253.     Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if fully set forth herein and make the same a part hereof.

254.     Defendants' enforcement practices are arbitrary, capricious, and inconsistent with the principles of administrative fairness under New York law.

255.     Such practices lack a rational basis and are applied inconsistently.

256.     Plaintiffs are entitled to appropriate equitable relief under state law.

257.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

258.     Under New York law, governmental action must not be arbitrary, capricious, irrational, or undertaken without a rational basis.

259.     Administrative enforcement actions must be applied consistently and without discrimination and must bear a rational relationship to the purposes of the governing statute.

260.     Defendants' enforcement of New York City Administrative Code § 24-163 through the Citizens Air Complaint ("CAC") program is arbitrary and capricious because it:

    (a) Applies materially different enforcement outcomes to similarly situated vehicle operators based solely on Plaintiffs' ownership status (public versus private).

    (b) Relies on a publicly articulated policy under which certain categories of vehicles are not subject to monetary penalties in OATH proceedings.

    (c) Permits systemic delay in the service of summonses that foreseeably results in the loss of relevant and potentially exculpatory evidence; and

(d) Imposes penalties through procedures that do not reasonably account for the operational and evidentiary realities of the regulated industry.

261.    These practices are not the result of isolated discretion but reflect consistent, ongoing administrative conduct in implementing the CAC enforcement regime.

262.    Defendants' actions lack a rational basis and are inconsistent with the Idling Law's stated purposes, including uniform environmental enforcement.

263.    Defendants' enforcement practices are therefore arbitrary, capricious, and contrary to law under New York administrative law principles.

264.    Plaintiffs have suffered and continue to suffer harm as a direct result of these unlawful practices, including financial losses, operational disruptions, and competitive disadvantages.

265.    The arbitrary and inconsistent enforcement practices described herein undermine the uniform application of the Idling Law and erode the predictability that regulated entities need to conform their conduct to governing standards.

266.    Plaintiffs lack an adequate remedy at law for the ongoing application of these practices.

267.    Plaintiffs are entitled to declaratory and injunctive relief under New York law to prevent further arbitrary and capricious enforcement.

WHEREFORE, Plaintiffs request this Court:

    a.  Declare that Defendants' enforcement practices are arbitrary and capricious under New York law.

    b.  Enjoin Defendants from continuing such practices; and

    c.  Grant such other relief as the Court deems appropriate.

**TWELFTH CLAIM**
**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs repeat and re-allege each and every allegation set forth in the foregoing claims of this complaint as though set forth herein at length, make the same a part hereof, and respectfully request that this Court to enter judgment in their favor and against Defendants on all counts and grant the following relief:

A.  Declare that Defendants' enforcement practices violate the United States Constitution.

B.  Declare that such practices are preempted when they conflict with federal law.

C.  Enjoin Defendants from enforcing the challenged practices.

D.  Award compensatory damages.

E.  Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

F.  Award such other relief as the Court deems appropriate.

**IX. JURY DEMAND**

Plaintiffs hereby demand a jury trial on all issues triable to a jury.

Dated: New York, New York
         May 11, 2026

By: /*s/ Joseph J. Ferrara*
    Joseph J Ferrara, Esq.
    Robert J. Hantman, Esq.
    **HANTMAN & ASSOCIATES**
    Attorneys for Plaintiffs
    1120 6th Avenue, Fl. 4
    New York, NY, 10036
    Tel: 212-684-3933
    Fax: (646) 380-3299
    jferrara@hantmanlaw.com